May it please the Court, I'm Deputy Attorney General Elaine Meckenstock on behalf of Appellants. As I said, I'm ceding four minutes of my time to Sean Donohue, and I would like to reserve four minutes for rebuttal. Counsel, would you please move the microphone up? Is that better, Your Honor? It is, because we have people in two other rooms, and I want to make sure they hear you. Understood. Thank you very much. In this challenge to California's Low Carbon Fuel Standard, or LCFS, Appellees attempt to expand the Dormant Commerce Clause doctrine and prevent California from following sound science to protect its citizens, its natural resources, and its economy from the threats of climate change. But the LCFS controls only the carbon intensity of transportation fuels sold in California and accounts only for the greenhouse gas emissions that result from those fuels. Unlike the very few laws invalidated under the Narrow Extraterritoriality Doctrine, the LCFS does not control any commerce in another state's market, let alone any transaction that has no nexus to commerce in California. May I ask you a question about that? Of course. You argue that the LCFS discriminates on the basis of carbon intensity and, therefore, that it is location neutral. But a major component of carbon intensity formula is how the electricity a producer uses is produced. Producers have no control over that. So isn't this the equivalent of discriminating against producers in states with dervious, end quote, electricity? Your Honor, it is correct that the low carbon fuel distinguishes on the basis of carbon emissions, and it is also true that the life cycle, the science of life cycle analysis includes electricity emissions in that analysis. But electricity emissions are not a proxy for location. For example, many, well, for one thing, the amount of electricity emissions varies significantly based on the plant's efficiency,  in addition, many plants, including plants in Brazil and the Midwest, produce some or all of their own electricity on site through cogeneration, using waste material from the production of ethanol or waste heat from the production of ethanol, and that electricity is very low emissions. So it is not true that there is nothing that a producer can do to reduce its electricity emissions. There are several things that producers can do, and it is also not true that electricity emissions are a proxy for origin. Thank you. You're welcome. In fact, the objective of the LCFS is to transform California's fuels market away from petroleum-based fuels and toward low carbon alternative fuels, including fuels that don't exist today, and regardless of where those low carbon fuels are produced. The LCFS distinguishes fuels, as we discussed, on the basis of life cycle greenhouse gas emissions, using real data, sound science, and the methodology that was adopted by Congress and the U.S. EPA. Thus, the LCFS expresses hostility to high carbon fuels, not to outside competition, as would be forbidden under the Dormant Commerce Clause. Now let me ask another question. The LCFS uses a carbon intensity formula that's been tailored to California called COG-GREASE. Assuming that multiple states adopt LCFS with carbon intensity formulas tailored to their own states, isn't economic balkanization a serious concern? I don't think so, Your Honor, because economic balkanization results when you have inconsistent regulatory obligations. For one thing, any state's LCFS is only going to apply to fuels sold in that state, and so no fuel will be subjected to more than one LCFS. In addition, the whole purpose of the low carbon fuel standard in California and in other states would be to reduce greenhouse gas emissions. Therefore, all of the incentives point in the same direction. So any effort that a fuel producer goes through to reduce its emissions or to invest in new alternative fuels would bear rewards under any state's LCFS. So there's no conflicting regulatory obligation, and there's also no conflicting incentives even. I guess I have a question regarding the benchmarks you used to start with that are attributable to everyone within California and outside California, and I'm trying to figure out the reason for the discrepancy. I guess you've talked about it in terms of transportation. It appears the district court found that to be discriminatory. And so is it your contention that the low carbon fuel standard currently written represents the only way that the lifecycle analysis approach can be implemented or ever utilized to address the greenhouse gas emissions? It's not our position that the LCFS is the only way the lifecycle could be used. It is our position that the lifecycle is the only way to accurately measure greenhouse gas emissions from transportation fuels. And this is true, and electricity is the best example of this. So electric cars that use electricity as a transportation fuel have virtually no tailpipe emissions. But to say that they are greenhouse gas neutral would not be correct because there are greenhouse gas emissions associated with producing the electricity that powers the car. And so that's why the lifecycle analysis is the well-established and well-regarded and only method to compare these fuels and ensure that what California is getting are real emissions reductions. But can the lifecycle process be modified so that it's regulated in a more neutral way or at least not in what appears to be giving favorable presumptions or assumptions to California versus the Midwest or folks outside of California? I look at Table 6, and it looks like when you look at the dry mill assessment, everyone, I mean, there's a 98.4 versus, I mean, there's like a 10% difference between California and the Midwest. And I'm just trying to figure out if there's a way that you can lower that assessment or make that assessment equal for everybody and then use the 2A and 2B process for everybody. Wouldn't that make this more neutral? Well, that's in essence actually what the LCFS does. So it looks at actual carbon emissions. And so the differences that you're seeing in Table 6 reflect true data about the actual carbon emissions associated with those fuel pathways. But it's making assumptions about the California producers versus the Midwestern producers from what I can see and from what the district court found. And so I'm just trying to figure out if, you know, what prevents you from adopting the lifecycle analysis approach that assigns CI values to specific elements without resorting to any geographical or other assumptions. Because when you look at the table, I mean, on its face it says California is 10%, you know, at a 10% benefit right out of the gate versus the Midwest. And couldn't these values be assigned in a way that it's equal or neutral across the board at the outset? Well, there is no escaping the fact that there is some nexus to geography in, for example, transportation emissions because you have to know the distance that something is being transported in order to calculate its transportation emissions. But that distance is not dispositive. Well, let's pause there on the transportation element of the lifecycle analysis. And I want to make sure I understand how it's calculated. Is it from transportation to the California border or transportation to the California distributor? What is it? It's transportation to the point where the fuel basically goes into California's market to be used. So it's to the blender essentially. And so it does include in-state transportation emissions. So California fuel producers also receive a transportation emissions assignment of a CI value. And, in fact, for California corn ethanol producers, transportation emissions are actually a disadvantage because those producers import corn. And that importation of the corn from the Midwest produces far more emissions than importing ethanol from the Midwest to California. So that's another demonstration of the way in which this is not a proxy for geography, that transportation emissions are determined by the method of transportation, by the distance, and by what is being transported, the energy density of what is being transported. And so, Your Honor's question, the 2A, 2B methods allow individual producers to come in and seek individualized numbers. And I do want to be clear that the CAGRE model is not – I just want to follow up on that because you said something like that transportation is factored in, in a neutral way, I think, from your position. But am I correct under the current low-carbon fuel standard, the out-of-state producers have to prove their fuel has a lower carbon intensity value than the baseline values listed in Table 6. Do they have to do that? In order to obtain a method 2A, 2B application, any fuel producer does that, must do that, including the California fuel producer who also applied for a method 2B value. But in your brief, you indicated that many Midwestern producers have used methods 2A and 2B to obtain carbon intensity scores lower than those achieved by California producers. Isn't that correct? That's correct, Your Honor. And I want to come back to Judge Merguia's point that the model is based on assumptions. It's not based on assumptions. It's based on actual data. But when ARB adopted the regulation, that data included averages. And the Midwest ethanol plants, there are a lot of them, and they span a gamut. But are California producers required to prove that their fuel does not have a higher carbon intensity value than the base values listed in Table 6? All fuel producers, all regulated parties, and out-of-state fuel producers are actually not regulated parties, but all regulated parties, when they report a carbon intensity value, are required to demonstrate that they're using the right carbon intensity value. And that obligation, that compliance obligation, falls on California entities, on the refiners and blenders who import the ethanol, and on California fuel producers, so on the California ethanol plant. So the model was not based on assumptions. It was based on published information about, say, average efficiencies of Midwest ethanol plants. And if a plant, and the average spans a large range, and so it is definitely possible, and we see in the registration list and in the 2A, 2B process, many Midwestern ethanol plants have lower efficiencies, have better efficiencies than average. And that's what the 2A, 2B process was designed to accommodate. And that is how these ethanols end up with lower carbon intensity values than California, which cannot protect California's ethanol industry, which is what the Dormant Commerce Clause is designed to prevent, is economic protectionism. But as part of that, it seems like distance is factored in, and that based on the distance that the product must travel in interstate commerce, it arguably adversely affects the Midwestern or outside of California producers. Well, if that were true, Your Honor, Brazilian ethanol wouldn't have the lowest CI of any ethanol. It travels more than 7,000 miles to get here. It appeared, and there was an argument, that the Brazilian ethanol is distinct or unique or can be distinguished. If we take that out, isn't it true that the Midwestern folks, I mean, people that have to calculate or have an adverse calculation because of the distance, it's in your method that that is what is happening. Well, I want to first say that Brazilian ethanol competes with Midwestern ethanol, and they concede in their briefs that Brazilian ethanol is actually the main competitor to domestic U.S. ethanol. So there's nothing different chemically about Brazilian ethanol and Midwestern corn ethanol. And secondly, as I indicated, the transportation is a mixture of factors, and Brazilian ethanol coming here has lower transportation emissions than California ethanol because it comes on a ship, which is an efficient way of transporting the ethanol. And I realize I'm running into my counsel's time, but I want to answer questions from the panel. So Dean Milk, how is this different from Dean Milk, the Dean Milk case? So Dean Milk set up a geographic boundary and said that you had to be within five miles, I believe, of the town in order to process the milk, and that was designed as an economic protectionist measure. I mean, it was clearly designed to protect the local industry, and most of the laws struck down under the Dormant Commerce Clause fall into that category, and the LCFS does not. In fact, it cannot. I mean, from the very beginning, Brazilian ethanol had a lower CI value than California ethanol, and now we see that Midwestern ethanol has many Midwestern ethanol pathways have lower CI values than California, and there's no reason to expect that the fuels of the future, which the LCFS is intended to generate, will come from California. This is not economic protectionism. All right, and thank you. May it please the Court. I'm Sean Donohue, and I'm appearing today on behalf of Environmental Defense Fund, Sierra Club, Natural Resources Defense Council, and the Conservation Law Foundation. We support the low-carbon fuel standard because it's a vital part of California's overall comprehensive program to address greenhouse gas emissions and serious risks to California's people and natural resources. The LCFS does something distinct from those other programs, but complementary to them, in that it encourages the development of new, very low-carbon fuels, a necessary part of reducing emissions from the largest emitting sector in California, transportation. But let me just ask, in California's final statement of reasons, the Air Resources Board specifically predicted that LCFS would provide, quote, needed employment in the state and increase the tax base by displacing imported transportation fuels with California biofuels. Isn't this unambiguous evidence that the Board was motivated by protectionism? We don't think this is a protectionist measure. It's a massive record, and there are a few stray statements in the economic analysis that the appellees have picked out to cast aspersions on this program. This program uses the same methodology that EPA, that Congress. Life-cycle analysis is unquestionably the scientifically appropriate way of regulating carbon from fuels. Our groups do not support this because we're in cahoots with California ethanol producers. California, in fact, doesn't know what the full impacts will be over time because this is a performance standard that creates incentives that are equally available to companies everywhere. My co-counsel mentioned Brazil, which produces low-carbon ethanol. This measure was not enacted to protect Brazil or help Brazil any more than it was California, but there are also cellulosic, very low-carbon biofuel producers throughout the United States, biodiesel producers located in Iowa and Florida, Mississippi. As we noted in the reply brief, and very contrary to any suggestion of discriminatory purpose or operation, 27 of the 29 lowest-carbon ethanols that had been registered as of June of last year were from the Midwest. So the operation, this is just another claim that because a state law is alleged to bear on some actors, that it must be unconstitutional. And the Supreme Court in United Hallers recently reminded us that the Deormant Commerce Clause does not set up federal courts as the sort of supervisors of state regulation. This case does not constitute, relies on a neutral methodology. It's scientific, and it is not geared to location. It's geared to carbon intensity, which is a valid factor. Let's say, though, hypothetically, we disagree with you that it's done in a neutral way. Is there no other means to achieve this purpose? There is no other way to get at carbon from fuels because they have suggested, oh, well, you could just regulate tailpipe emissions for reasons we've demonstrated. That doesn't capture the true emissions. Electricity would look like it has zero emissions when, in fact, electric fuel has emissions because electricity has to come from somewhere, and generation often has significant emissions. And the suggestion that California has tailored its version of the lifecycle analysis is just not supported. This is a California version because it had to look at the physical realities in California, but it's the same lifecycle analysis that EPA uses. It's the same concept. Transportation emissions are part of that. Let me just ask you, you mentioned the tailpipe emissions, but it looked like evidence in the record suggested that with respect to gasoline, 75% of the GHG's emissions occur when the fuel is combusted, with 25% occurring during earlier lifecycle events. And I think the district court made some findings or made a statement that it looked like that's perhaps a far superior way. Well, that's a completely ineffective way of getting at fuel carbon. California does regulate, of course. California enacted first in the nation greenhouse gas emission standards for cars, but that doesn't get at carbon-intensive fuels, and it doesn't get at this problem that tailpipe emissions, as with electricity or ethanol, don't reflect the true carbon impact. So California here is using what all informed scientists and policymakers recognize as the way to get out that problem. It's not discrimination based on location. And the incentives that this law creates, of course, it applies only to sales in California, but the incentives are available everywhere. As I mentioned, Brazil, throughout the country, there are cellulosic ethanol concerns starting up. And so it's just not – this is really a claim that this burdens us. It's not that different from the claim in the Black Star Farms case that, well, an in-person exception to the wine sale law burdens us because we're far away and we don't have as many in-state sales, and that's just – Your time is up. Okay. Thank you very much. Good morning, Your Honors, and may it please the Court. My name is Peter Keisler. I'm here on behalf of the plaintiffs in the American Fuel and Petrochemical Manufacturers case, and I'll be splitting the appellee's time equally with Mr. O'Quinn, who's here on behalf of the plaintiffs in the Rocky Mountain Farmers Union case. And both of us are prepared to address both the discrimination issue and the extraterritoriality issue. And I'd like to begin, if I may, with discrimination and with the questions, Judge Murguia, you asked of my colleagues on the other side. A penalty for transportation inherently discriminates by origin. It puts you at a greater competitive disadvantage the farther you are from California. And counsel for California referenced the Method 2A and Method 2B vehicles through which a few Midwest ethanol producers have gotten different carbon intensity scores. Every one of those scores would be better and more favorable if you picked up their operations and moved it to California because then you would eliminate the transportation penalty. Everything is better under this system if it's in California. And Ms. Meckenstock mentioned that currently some folks in California get more of a transportation penalty because they have to import the corn. But what the mathematics of this system drives you to is to move both the corn or other feedstock and the refinery operation into California. The most efficient way to make ethanol is to have the feedstock and the refinery next to one another and under this system to have it in California. Everything is better if it's moved to California under this system. Your opposing counsel and colleague made a point regarding the Brazilian ethanol and I'd like for you to address that. If you picked up the Brazil operation and moved it to California, it would get a more favorable score as well. Everything that is moved to California gets more favorable. And specifically with respect to Brazil, it's important to understand the principal competitor to California's alternative fuels industry is Midwest ethanol. It accounts for the overwhelming majority of the ethanol that comes into California. The EPA has said that Brazil represents a tiny piece of the ethanol market here. This would be like lobbyists for Coca-Cola getting a bill passed that devastates Pepsi and saying it's not anti-competitive because Royal Crown Cola is helped by this. Brazil is the Royal Crown Cola here. It is not a competitively significant threat to the California industry. But what California has said, California has said that Midwest ethanol under this system will be eliminated, not just weakened, but eliminated from the California market by 2018. It doesn't account for the impact that many Midwestern producers have used methods 2A and 2B to obtain carbon intensity scores lower than those achieved by California producers. If this is possible. Because of the discriminatory effect, each of those producers would do even better if they just moved to California. They are still paying the transportation penalty that's inherently discriminatory. They have just made up the difference in some other ways. And the other point that I think that raises, California says that the system can't be discriminatory because there are some out-of-state interests like Brazil and perhaps like some of these Midwesterners that are benefited and some California interests that they say are disadvantaged. But the Supreme Court has been very clear that that's not the method of analysis. In cases like Hunt v. Washington-Apple Commission and New Energy Company v. Limbach, there were out-of-state interests like perhaps these Midwest producers that were benefited. And in cases like Carbone and Bacchus v. Diaz, there were some in-state interests, some that were hurt by the scheme. But the court struck down all of those schemes as impermissibly discriminatory because, as the court said unanimously in New Energy Company v. Limbach, when you have facial discrimination, and here you have discrimination as facial as it could be, the words Midwestern and California appear in the text of the regulation to denominate who gets favored and disfavored treatment. When you have patent discrimination, the court said, neither a widespread advantage to in-state interests nor a widespread disadvantage to out-of-state interests is necessary to be shown because the court said varying the bar against economic protectionism would just add more uncertainty to a system which is already, the court said, needlessly complex. Let me ask you this then. Are you suggesting that if California required every distributor to obtain an individualized pathway that reflected the fuel's actual total carbon intensity, that this would be constitutional? No. We wouldn't say that, Your Honor. And, of course — Is it possible that the current regulation, anyone may ask for an individualized — Well, under the current regulation, if you are a California producer whose carbon intensity is in fact higher than what the regulation assigns, you get the benefit of the lower, more favorable score. No one can force you to get the higher score. If you're a Midwestern producer who has a lower score, then you have to go through this burdensome process. But if, as I understand Your Honor's question, if everybody would just compete with their own method 2a and 2b, then we wouldn't have a facially discriminatory statute. We wouldn't have a regulation which says on its face, if you're California, you get this treatment. If you're Midwest, you get that treatment. And we think once you have that facial discrimination, then the precedents are clear. It has to be subjected to strict scrutiny. But if it was a regulation which had no facial references and simply said everybody applies under the model, then we just have to go through another step to show it's discriminatory. And we believe that when it uses transportation as a key criterion and penalizes everybody, the further you are from California and the further you have to transport your fuel or your feedstock, then, yes, we would still say it's discriminatory, but it would be discriminatory perhaps for an additional reason that we don't feel we have to show here. So I want to follow up on that to make sure I understand your position. So is it your position that any regulation incorporating a lifecycle analysis approach is discriminatory or can that approach be implemented in a non-discriminatory manner? I think if one wants to do a lifecycle analysis, to the extent one believes that transportation is inherently part of the calculus, then it would have to be done by the EPA or by Congress at a Federal level. Because, yes, Your Honor, I do think that any analysis that incorporates a transportation penalty, among other things that we've pointed out here, is inherently discriminatory. But all that means Well, there could be a lifecycle analysis without a transportation penalty that would be non-discriminatory. We would still have issues with other aspects of it. I understand. You probably have issues. Yes. Judge Nelson pointed out that the source of electricity is something that's very much tied to origin. Whether electricity is expensive or inexpensive or meets environmental standards is completely a function of what the State regulation there is. So we do actually think there are other aspects in which this would discriminate by origin. But if Your Honors are persuaded that the transportation penalty alone makes this But, again, this doesn't We disagree with you on that. Well, even if It suggested that individual pathways would be, since any company may submit an individual pathway, why shouldn't we apply the type factors in balancing whether it's discriminatory or not? Well, if Your Honor concluded that the facial discrimination on this regulation did not render it discriminatory and rejected our discrimination arguments, then we would still have our arguments that this is impermissibly extraterritorial. Because the Supreme Court said in Carbone that a State may not, and this is quoting the Court, attach restrictions to imports in order to control commerce in other States. Because it said to do so would be for one State to extend its police power beyond its jurisdictional bounds. So even if there was no discrimination, even if Your Honor rejected all of our arguments on that point, you still have a regulatory scheme whose whole purpose is to penalize imports in order to change out-of-State conduct in order to reduce out-of-State emissions. And the term carbon intensity is really a misnomer here. Because it's not measured by how much carbon is in the fuel. It's not measured by how much emissions are released when the fuel is combusted in California. That's something that California certainly can regulate under the Commerce Clause. It's a shorthand for these other activities in the making and transporting and producing of the fuel that take place in other States that are begun and completed before the fuel even reaches California. And that have nothing to do and no effect on how much greenhouse gases are emitted when the fuel is in California. And that's why CARB acknowledged in this litigation that it is, quote, legal and political responsibility for carbon emissions regardless of location. Which is an acknowledgment that the practical effect of this regulation is to attempt to project California's environmental standards into other States. I see that my ten minutes is up. If I might, Your Honor, I'd like to, if it's okay with the panel, to yield the podium to my co-counsel. Yes, of course. Thank you, Your Honors. Just picking up on Mr. Keisler's last point, I think it's worth highlighting what's not in dispute in this case. California is generally free to do what it wants to reduce emissions that actually occur within its own borders. But that's not what California is doing. What California is doing is using the LCFS to try to change out-of-State emissions from out-of-State production processes, out-of-State farming practices, and out-of-State transportation. And I think what perhaps illustrates that most vividly is if you look at the treatment of distiller's grains, a co-product that is made with ethanol, and what California says that it can do with respect to those distiller's grains. California says that the stream of conduct is fair game, that everything that is in the stream of conduct, the stream of commerce that leads a gallon of ethanol into California is fair game for it to penalize. And it says, quote, co-products like other elements of the life cycle are not wholly out-of-State commerce. Now what California is saying is not wholly out-of-State commerce. It's the production of distiller's grains. It's the protein separated from the starch. The starch makes the ethanol. The protein is used to make an animal feed. It's an animal feed made outside of California, sold outside of California, and in many cases consumed outside of California. And nonetheless, California is saying that they can regulate that, that they can penalize that as part of the stream of conduct. And I think — Assume that California — Judge Nelson, I'm not hearing you. Are you hearing me now? Yes. Now. Thank you. Assume that California passed a new law requiring glass manufacturers to use less lead in products marketed in California. According to your argument, as I understand it, and please correct me if I am incorrect, according to your argument, doesn't that control the actions of out-of-State producers by forcing them to change their manufacturing practices if they want to keep selling in the State? Is that correct? I think not, but let me understand the hypothetical, Judge Nelson. I mean, if the concern is that there's going to be lead in the glass that makes its way into California, what California can permissibly do, and what any State can permissibly do, is regulate a product because of the harmful effects of that product's presence in the State. But what it can't do is use that product's presence in the State as leverage to try to change out-of-State commerce that has no bearing on the product that makes its way to California. This was a point that Mr. Keisler was getting at a moment ago. Ethanol, however it's made, wherever it's made, is chemically and physically identical. California accuses us of trying to raise some sort of physical identicality rule. We're doing nothing of the sort. The fact that these products, when they show up in California, are identical, demonstrates that what California is trying to do is to regulate the out-of-State processes by which those products were made. Because what finds its way into California is absolutely the same no matter how it's made. And so that's the point that low-carbon intensity ethanol is exactly the same as high-carbon intensity ethanol. Just like low-carbon intensity shoes are exactly the same as high-carbon intensity shoes. The only difference in those products is how they were made, how much energy was used back at the plant, how far they were transported to get them to California. And under California's rationale, it would be able to regulate any production methods anywhere in the world. It would be able to penalize any production methods based on the greenhouse gas emissions just because the end product finds its way into California. The Supreme Court in the Boston Stock Exchange case made clear you can't do that. A transaction at the end of interstate commerce does not give you a hook to be able to penalize the stream of conduct that occurred leading the product into California. Let me ask you a question, Counsel. The District Court cited a number of or some alternative approaches California could implement to effectively reduce the greenhouse gases, but noted, and specifically noted, that these alternatives may be less desirable. So trying to figure out, by saying that, doesn't a less desirable alternative mean that under Maine versus Taylor, there really is no other comparable nondiscriminatory means to achieve this goal? No, Your Honor. I think when the District Court said that, it's the same thing that the Supreme Court said in Dean Milk, that the Supreme Court said in Carbone, that the Seventh Circuit said in Meyer. There may be more desirable ways that a state would like to have at its disposal, but in order to meet strict scrutiny, and that's what you have to apply here, because on the face of the regulation itself, it discriminates between California ethanol and Midwest ethanol. Under strict scrutiny, you've got to show that there is no other way to achieve those goals. And here, as the District Court observed, as CARB itself has admitted, as their own experts admitted below, there are a number of other ways that California can achieve its goals, and that should be dispositive of the discrimination issue. A number of ways. I thought there were three. One is to effectuate this life cycle analysis in a way that's not discriminatory. Two, I think it was taxing fossil fuels. Is there any or what is the evidence, I guess, that supports this suggestion that taxing fossil fuels or regulating the tailpipe emission reduces the greenhouse gases to the same degree that the life cycle approach would? Sure. Judge McGee had two points. One is California could certainly structure its regime in a way where it tries to reduce the consumption of Californians. And it could structure its regime in a way that reduces the emissions that occur from industry within its own state. California is free to strike that balance. But what it's not free to do, whether you think of it as being discrimination or whether you think of it as being extraterritorial or both, and it is both, what it's not free to do is to tell Kansas or Nebraska or Illinois, you have to strike a particular balance. And that's what they're doing with the life cycle analysis, the way it's being applied, and that's what they're doing with the LCFS because, again, Sorry, did you answer my question? I thought I did, Your Honor, in the sense that What was the answer? I mean, is there evidence that supports that these other means, you know, are equally or more effective than the life cycle analysis? Absolutely, Judge McGee. If what you're talking about is reducing greenhouse gas emissions, that California does have legal responsibility for. There's no question that a reduction in consumption will reduce greenhouse gas emissions. There's no question that a carbon tax To the same degree as the life cycle analysis. Well, Judge McGee, the evidence in the record is that the life cycle analysis is not going to reduce greenhouse gas emissions at all. There's evidence that, and CARB concedes this, that with respect to the approach they've taken, it's just going to result in fuel shuffling. Well, I don't know that the district court agreed with you on that. I don't think this is a referendum on the life cycle process. I think the question is whether that can be achieved or, you know, implemented. Is it not flexible enough that it can be implemented in a way, in a different way that's not discriminatory? Well, and perhaps the best illustration of that, Judge McGee, is to look at the difference between how California approaches ethanol and how California approaches crude oil. Because with respect to crude oil, California doesn't use different individualized pathways. It takes an average approach. With respect to ethanol, it takes a discriminatory, individualized pathway approach. Now, the reason for that is that if you took an individualized pathway approach to crude oil, the upshot of that would be for in-state consumers to use oil other than California oil. Now, the thing that these two different approaches that California has taken in the LCFS have in common is that they both serve to benefit California industry. A life cycle stream, individual pathway approach benefits California consumer, excuse me, benefits California industry. An average approach, because California's oil would actually have a higher carbon intensity, an average approach serves to benefit California's oil industry. The one thing these have in common is that they serve to benefit California. Coming back to one of the questions that you asked, Judge Nelson, with respect to some of these individualized pathways that have been sought, a couple points. One, they are an apples to oranges comparison. They involve different production processes. They involve different feedstocks. Most of the processes that you referred to do not involve corn as a feedstock. They involve like a wheat sorghum slurry. It's a different process. If you picked it up and you moved it to California, they would qualify for a lower feedstock. But even if they didn't, they are the exception. If you look at ER 3590, most corn ethanol produced in the United States falls in the category that California says has a higher carbon intensity than baseline gasoline, which means it is inherently disfavored under the LCFS. I see my time has expired. If the panel has any other questions, I'm happy to answer them. Just before you sit down, let me ask Judge Fletcher, do you have any questions at this time? No, I've been very interested in the questions which have been asked, and some of the answers seem to be very satisfactory, others not so much. Thank you, Judge Fletcher. Thank you. You may be seated. I realize I have a very limited amount of time, but I would like to make a couple of points in response to what was said. One is that there is no transportation penalty in the LCFS, and the idea that you could pick up and move a plant from Brazil to California or Midwest to California is unrealistic. The life cycle analysis looks at the facts on the ground. Where the feedstocks are grown, we don't grow sugar or corn in California. The LCFS just simply takes a look at what is really happening in terms of emissions, and that is the basis other than origin, which the Supreme Court has recognized in chemical waste and many of the other out-of-state waste cases is not discrimination under the Dormant Commerce Clause. They haven't challenged that transportation emissions must be part of the life cycle or that the science underlying California's life cycle is valid. Thirdly, if some of California's business in fuels shifts from firms in the Midwest to firms in Brazil, that's not a Dormant Commerce Clause violation, as was held in Exxon and Black Star Farms. That's also true if some business shifts from Midwest corn ethanol producers to sergum or slurry ethanol producers or to cellulosic ethanol producers in Nebraska. The Dormant Commerce Clause prevents economic protectionism. I want to ask you a question, and I asked your colleague, but I'd like for you to answer it. Is there, like your view on this, is there no other way to achieve this goal? Is there no other means other than the way that you have implemented this life cycle process with the distinctions for the Midwest and California? To get a realistic life cycle assessment of a fuel's greenhouse gas emissions, which is the only way to accurately measure them, you have to include all of the standard life cycle factors, which is what California has done. So, no, there is no other way. And so an individualized pathway for everyone or giving assessments. I mean, it seems like if you look at Table 6, you give everybody, if you gave everybody the Midwestern number or somewhere in between the California and the Midwestern number and then give everybody a chance to do the individualized process. Why wouldn't that be a reasonable alternative to what you're doing to achieve the same goal? Well, what we've done is look at the real emissions data, and then people can apply for an individualized pathway if their value is different from what the data told us it should be. But you have different starting points. But those starting points reflect real emissions differences in electricity in California. Is there any way to account for them differently so that in your text, which you have to admit designates Midwestern versus California? It designates some averages related to Midwest and California plants, which are different as a matter of fact. So the answer to my question is no. There's no other means, you're saying, to achieve your goal. There's no other means other than to use a real life cycle analysis because if we veer from the science, then we're no longer capturing accurately what the real emissions are. And I appreciate, I mean, there's a lot of science that goes into it, but is it that inflexible? Well, I don't think the LCFS is inflexible because as you can see from the number of Midwest plants that have applied for 2A, 2B applications, it's not that burdensome to get an individualized pathway if you qualify. Thank you. Do you have any other questions? No, thank you. Judge Fletcher, do you have any questions? No, it's perplexing. Okay. Thank you. Thank you very much. I'd like to thank you all for your presentations today. We have a lot of law students who are observing, and this was an excellent presentation on both sides, and I commend you both for your fine presentations. Thank you. I concur. We're going to take a short recess to allow the other parties to come in and to allow anybody who wishes to leave at this time to leave. So we'll just take a five-minute recess at this time. All rise. This court stands in recess for five minutes.
judges: Fletcher, Nelson, Murguia